Next case in the docket is Opp v. Bethalto Comm. School Dist. 5090132. I have Rob Swain and Stephanie Jones for the appellant. Have you divided up your time? Mr. Swain is going to do all the argument. Mr. Antignoli for the appellee.  Mr. Swain on behalf of Bethalto Comm. Unit School District No. 8. We have here as we set forth the briefs what I believe is a classic case of a unilateral mistake by the plaintiffs, the appellees here, which was bootstrapped at trial into an allegation of mutual mistake in which the circuit court then relied upon to make an order of reclamation to a deed that was transferred from the school district to the plaintiffs. The underlying transaction concerned the sale of an unused school building that was sat on a larger campus with some other school buildings, with some baseball fields, with some parking area and so forth. It was an undivided parcel, but the building itself had sat vacant for a couple of years. The school board, pursuant to a procedure set out in the school code, section 5-22, adopted the finding that the property was unnecessary for school purposes because of the threshold requirement for disposing of school-owned property, and then sold off the school building, the storage shed that stood behind it, and then some of the land surrounding it. The transaction is set out and documented quite well for the number of documents given the statutory danger of the sale. There were eight documents that really laid out the transaction. There was first a preliminary appraisal that the school board commissioned, so it was making a determination whether they wanted to proceed with the sale. The preliminary appraisal came back with a value of $180,000. It did not have a defined parcel because no survey or subdivision had been made yet, and so it said that it was assuming there was about 50,000 square feet of land that would go with the school building, but included specifically an asterisk next to that figure that said subject to survey, and included a specific limiting condition that said no survey has been prepared, no actual dimensions or boundaries are available. Anything in the record to show how they came up with approximately 50,000? No. The appraiser testified that he thought that might be about appropriate in terms of the land and building ratio, but essentially it was an estimate. After receiving the preliminary appraisal, they decided to proceed with the sale. They commissioned a survey so as to create a plan of subdivision. The survey came back, partitioned off this corner of the larger campus. The survey showed 35,268 square feet of land. The board then adopted a public resolution resolving that the property as defined in the survey was not necessary for school purposes, which is a threshold requirement under Section 5-22, and resolving that it ought to be sold. They filed that survey in the recorder's office. They published bids, I'm sorry, they published notices for three weeks running in a local newspaper that set out a full legal description as developed by the survey that specifically said there are 35,268 square feet of land included with the parcel being offered for sale. The resolution they adopted in the sale included the legal description that said 35,268 square feet of land. They went through an open public bidding process in which there was only one bid submitted, and that was the bid of the plaintiffs. They submitted a bid that they pulled out of thin air was their testimony. They exceeded the minimum bid amount by a certain amount, hoping that they would be outbidding any other potential bidders. But it was nothing that was, say, a multiplier based on acreage. Mr. Ob Blaneth literally testified that he used his high school football number of 55 to use 55 cents as his bid amount. It was a lump sum bid that they submitted. The sales contract that was executed referred back to the survey. The deed referred back to the survey. And the land that was conveyed was the land that was set forth in the survey. Now sometime later, when the plaintiffs allegedly came to realize that the survey land did not have exactly 50,000 square feet, they filed this action alleging there was some mutual mistake. Now in order to establish a mutual mistake, they must show by clear and convincing evidence that there was an actual meeting of the minds between the parties. And it's important here that they specifically disclaimed any allegation of fraud. Pretty significant difference, 14,000 square feet. Yes, Your Honor. That was just one side's error? I'm sorry? Just one side made that error? Both sides made the error. Well, actually, Judge, you know, the 50,000 square foot figure came in the first document that was prepared chronologically. It came before the survey had ever been drawn. And it was made as an estimate by the appraiser. Now when the survey came back, essentially drew some boundaries around this parcel, it then provided specific boundaries. And the preliminary appraisal itself was subject to survey. Now even looking at perhaps the most favorable plaintiffs, you might consider this. If they contemplated some sale of 50,000 square feet, then how might they go about declaring a different intent after the survey had actually been prepared? They recorded a survey that served 35,000 square feet. They adopted, they read out loud in a public meeting, a resolution that said 35,000 square feet. They published notices that said 35,000 square feet. You know, I don't know what more the school board could do to essentially, if this was necessary, correct a statement of its intent. Then to make all these public statements that they were offering 35,268 square feet for sale. The plaintiffs have argued, apparently, that they were relying upon some statements of the superintendent of the school district. And the circuit court found, in thinking that she was finding a mutual mistake, that the cops were mistaken as to the size of the parcel. And the board was mistaken as to what Mr. Harshi, the superintendent, told the office. Even if all that were true, that doesn't become a mutual mistake. The mutual mistake must still establish an underlying agreement, an underlying meeting of the minds. If Mr. Harshi made some mistaken statement to the plaintiffs, and unintentionally misled them, which is a phrase they use in their briefs, that might be relevant if we were here discussing, say, fraud. But in alleging mutual mistake, the plaintiffs must show that the board actually intended to sell 50,000 square feet. And there's no evidence of that anywhere in the record. The board never offered 50,000 square feet for sale. The board never took bids on a 50,000 square foot parcel. All the reliance upon discussions with Mr. Harshi came early in that process. After the preliminary appraisal had been prepared, before there was a survey, before there were notices being published. And none of those discussions reflect the board's intent. The board's intent is set out and required by statute through the statutory process. There's a public policy underlying the statutory process as well. It requires a two-thirds supermajority before disclosing of school property. You know, this is property that has been paid for by public funds, committed to public use, and that was being used by the school district as the plaintiff submitted a trial. The circuit court took 50,000 square feet out of a baseball title that was in use by the school district and conveyed it to the plaintiffs to take it away from public use. And so not only have we lost public property, but we've not actually received value for it because we never offered it for sale in the first place. The ops testified at trial they never intended to receive a baseball diamond. Mr. Opp testified that when the boundaries were staked by the survey, he walked those boundaries. He understood where they were, and they substantially complied with the property as conveyed. Notwithstanding some confusion about the actual size of the parcel, the boundaries were proper. And that illustrates as well what we have here is a sale and gross. The sale and gross doctrine says that when a parcel is defined and sold by means and bounds, by governmental description, those means and bounds govern over any misstatement of the status. That's been the law in Illinois for a century. We cite the cases throughout everything. And the policy behind the rule is that it creates certainty in the real estate transactions. We avoid litigation over misstatements as to size, because when the means and bounds are defined and known, those are the means and bounds that govern. To the extreme that if we had a misstatement in the deed itself as to the size of the parcel, the means and bounds would control it. The only evidence here that says 50,000 square feet was a preliminary appraisal prepared before the transaction even began. Now the ops relied upon that. They relied upon a clear judgment. And frankly, if they had alleged unilateral estate, so as to support a cause for rescission, we'd be having a very different conversation. But they alleged in the Circuit Court of Washington an unusual mistake, with literally no evidence that the school board had ever offered 50,000 square feet for sale. The deposition, the trial, the plaintiffs were never even going to tell us. They were never able to tell us. Which additional 14,000 square feet were you to receive? Plaintiffs didn't ask for rescission of the contract. That's correct. They asked for affirmation only. Frankly, I think they've overreached. If this were rescission, we'd be having a very different conversation. Mutual estate must be common and mutual so that both parties are laboring under the same misconception. So the only time this 50,000 came up is that first walk-around with the superintendent? No, sir. Not in the walk-around. In the preliminary appraisal. Is that the only time that the 50,000 square feet was referenced? Yes, sir. There's some conversation between the superintendent and the plaintiffs, where he provided them with a copy of the preliminary appraisal. But as Mr. Roth testified, he didn't come right out and say during the conversation it was 50,000 square feet. It was simply a matter of providing him a copy with some information because he had shown some interest in purchasing it in the past. So even before the school board decided to make the sale, he provided Mr. Roth, the superintendent provided Mr. Roth with a copy of the preliminary appraisal. But every document that followed, every document to the public record, either contains the exact numerical size or relates right back to the survey which was not filed to the court of appeals. Adding, frankly, some insult to injury, the trial court awarded attorney's fees to the plaintiffs after finding this mutual estate. And as we addressed in a recent hearing, because I think the plaintiffs all conceded theirs, there's simply nothing here to support the award of attorney's fees against the school district. There's nothing in Section 5-22, which is the statute governing sale of school property. There was no factual basis in the sales agreement for an award of fees. The Illinois law is clear that fees cannot be shifted after either a statutory legal basis or some provision in a contract between the parties that would provide them. There's neither here. But the judge made that award. The plaintiff's position in there agrees that no award is actually then entered. But for that matter, no petition by them is actually filed yet either. So right now, as we stand here, I think that issue remains open for a petition to be filed. How did it procedurally come up in the case? It came up as the circuit court was issuing her ruling. Frankly, there was never a request by the plaintiff. It was never discussed. It was never addressed. She was announcing her ruling from the bench. At the very end, she said, plaintiffs are awarded their attorney's fees and costs of suit. But the plaintiff has not tendered any timesheets? But they have not tendered a petition for fees. That's correct. So at the very least, even if there was some mutual mistake, there would be no basis for awarding fees against the school district here. In conclusion, I think the evidence is clear. The plaintiff's had a burden of showing by clearing convincing evidence that there was a mutual mistake, that there was an actual meeting of the minds, but that for some mistake, the written instrument did not accurately reflect that meeting of the minds. The fact is there's no evidence anywhere that the board ever had any intent of selling 50,000 square feet. There's evidence of a unilateral mistake by the plaintiffs, but that does not support reformation. It doesn't support precision. We'd be having a different conversation if they saw it. If they saw reformation, reformation was granted. It has to be reversed. Thank you, counsel. We have an opportunity for rebuttal. Mr. Antonioli, for me.  May it please the court. Counsel. David Antonioli, representing the plaintiff's appellants, Margaret Off and Austin Off, the buyers in this transaction. The fundamental flaw in the district's argument in this case is it ignores the applicable standard of review on appeal. This is not an appeal from summary judgment. It is an appeal after a full-blown bench trial in which the circuit court heard all the evidence, evaluated the witnesses, and made specific findings of facts, specific findings using the clear and convincing evidence standard. The court found that the buyers intended to purchase and the school district intended to sell the parcel of real estate envisioned in an appraisal that formed the very basis of the bargain. That the only reason that that description did not arrive in the deed that ultimately conveyed the property was because of a Scribner's error, a mistake in which the survey parcel was substituted for the parcel envisioned by the appraisal. That decision is supported by, or those findings, rather, are supported by ample evidence in the record. Did your clients walk the property? Yes, they did. They walked around in a circle. They did not walk towards specific boundaries. What they did, according to the testimony, is they, and let's just back up a little bit. Well, let me ask this. Did they walk that portion of the baseball field that presumably has been taken during the reformation of the contract? No, the testimony was that they walked around in a circle around the property, just looked at it. They didn't walk specific boundaries. Any testimony that they thought that when they walked, wherever they walked on the property, that it included the part of the baseball field? There's no testimony that they thought that it did or that they thought that it didn't. No testimony by any party. What they envisioned was what the appraiser testified that he envisioned the survey parcel, or this parcel, would look like. First of all, let's look at the context in which this appraisal was made. The school superintendent sits down with the appraiser and he says, we want to determine what we can sell here. They go through a process of looking at, there's an existing building on the property, and the appraiser testifies to this process. He says to the superintendent, well, you need to have an adequate land to building ratio. In order to have an adequate ratio, you need to have a 50,000 square foot parcel. We know where the front of this parcel is, because it's right on a public highway. We know where the side boundaries are going to be, because on one side of the property we have other property owners, so that boundary is fixed and ascertainable. And then we know where the other side boundary is, because it's going to be halfway between the building on the parcel to be sold and the building on the parcel to be retained. So all we've got to do is project it backwards to comprise the 50,000 square foot parcel that would contain the adequate land to building ratio. This is the process that the appraiser testified. He went through with the school superintendent in determining, in figuring out what parcel he was appraising. And the appraiser testified in spades that the school district superintendent approved the appraised parcel. Let me ask you two questions. Was your client at the public hearing where the board president read the legal description and the square footage of 35,268 feet? No. Is there anything in the record to support that your clients never saw the public notice in the Alton Telegraph? Yes. What is in the record? Their testimony. They denied seeing it. They denied seeing it. In addition, Who are the sellers? Is it the Board of Education? The school district. School district. Their resolution that they had to pass to conform with the statute provided for 35,000 square feet? Well, that's a good question. The answer is maybe because they had two different resolutions and the two resolutions are in conflict. Let's look at the first resolution. That's the one that was adopted prior to the bidding process. That one, in the body of the resolution, it contains only a common address, no reference to the size of the parcel. It contains a minimum selling price which, by all accounts, was based in reliance on the appraised parcel, the 50,000 square foot parcel. The statute is surveyed, though, right? Yes, and the appraiser testified that what he meant by subject to survey was minor discrepancy. You don't get a 14,000 square foot discrepancy because you're moving a boundary three feet. This is a situation where they come up with a deed conveying about two-thirds of what this property appraised had, two-thirds of what the board relied on in selling, in fixing the minimum sale price. The only thing in this first resolution that has any reference to a legal description is in an exhibit. Now, the exhibit does, after the meets and bounds description, contain a specific reference to square footage, but the legal description itself is erroneous. It refers to property in a different section. The legal description in this first resolution is riddled with errors. Then we go to the second board resolution. This one was passed after the bid was submitted. In this resolution, there's no reference made to the first resolution. There's no reference to the size of the parcel. There's no reference to any meets and bounds description. All there is is reference to the common address of the property and, of course, to the minimum selling price. The minimum selling price, of course, was based upon the appraisal, the parcel envisioned by the appraiser, the parcel approved by the school district superintendent when he commissioned the appraisal. The whole argument that there is an unmistakable paper trail evidencing the district's intent is undermined by the errors and inconsistencies in its own resolution, its own document. But wouldn't the board statement and the public notice that clearly said $35,000 indicate there was not a mutual mistake but a unilateral mistake? Only if one surmises that the board actually had some understanding of what this public notice said.  Including reference to the wrong section of the property. There's no indication in this public notice that that properly reflects the intent. The best evidence of the district's intent is what it used as the minimum selling price. Wasn't there a recorded plan that had the proper... After the survey was prepared, the survey was used to have a subdivision plan approved. And that was recorded and that properly showed $35,000 plus square feet. Well, it showed a parcel that consisted of $35,000 square foot. The question, of course, is whether it properly showed that. The evidence that the trial court believed... Well, the dimensions showed that. Yes. Right? Yes. And that was what the second resolution passed presumably authorized the district to sell. Yes. So they authorized selling of the land that was in the plot of Block 1 that was recorded. Yes. So the question is, did the school district believe that that parcel consisted of 50,000 square feet, which is indicated, of course, by the school superintendent's testimony and which is indicated, of course, by the fact that they used a minimum selling price based on the parcel envisioned by the real estate appraiser consisting of 50,000 square feet. So really, in a reformation case, you're always going to have papers that are inconsistent with the party's intent because you wouldn't need any reformation if the paperwork coincided precisely to the party's intent. Does the deed refer to the plan? Correct. And there's no reference to square footage in the plan. But we all agreed that the plan consisted of 35,000 square feet, basically. Correct. There's the lot that's described in the deed. If you were to go back to the county recorder's office and look at a plan and then check the dimensions of that plan, it would comprise 35,000 square feet. If the actual measurements of the plan ended up conveying 60,000 square feet, would your client say, I'm only entitled to 50,000 square feet? I think he would, yes. He'd be stuck with the original? Yeah, I think he would be subject to the same litigation by the school district. If the school district made a mistake and the school district had ample evidence that it was a mutual mistake because my client admits repeatedly that he relied exclusively on the parcel envisioned by the appraiser. Is your position that the only way, assuming that reformation is appropriate here, that the only way that the court could have reformed and did reform the contract was to extend it out? That was the only possible way to do that? Yes. Was to extend it out? Because that's what they... X number of feet. It was a perpendicular or a square plot and then you could just calculate it there, right? Exactly. But neither party intended it to include the ball field, which is exactly what it included. Well, excuse me, Your Honor. This argument has been made here. There's no evidence in the record as to what part, if any, of this baseball diamond the reform deed includes. Furthermore, there is no testimony in the record that the parties negotiated the size of the parcel with reference to this baseball diamond. The baseball diamond is nothing but a red herring, a smoke screen, that's been thrown here up in front of the appellate court in order to undermine factual findings in the trial court that are supported by evidence. Now, one thing that I think that the court... I would invite the court's attention to is the fact that we're dealing with agents here. The school superintendent was, by admission of the school board, fully authorized to handle this transaction. The school superintendent's testimony was that he thought that the property that was being conveyed when that deed was delivered at closing was substantially the same parcel envisioned by the appraiser. He said he was ignorant of any discrepancy between the appraised parcel on one hand and the survey on the other. He testified that he didn't even pay any attention to the square footage notation in the survey or in the public notice. All this evidence suggests strongly that the school superintendent, on one hand, and the ops, on the other hand, were both on the same page. They were both thinking that the ops are buying and the district is selling the same parcel envisioned by the appraiser, a parcel consisting of 50,000 square feet. This is not a case of unilateral mistake. This is a case where we have two folks on the same wavelength and the trial court has crafted a deed that conforms to their mutual intent. Counsel, is it your all's position that the agreement was approximately 50,000 square feet or was it actually 50,000 square feet? If it turned out to be 48,000 square feet, is that close enough for government work here? The appraiser testified that the tolerance has to be less than 1,000 square feet. It has to be something that's very close to 50. Anything more or less than 1,000 square feet would... Would be a different parcel. Would still be here? Yes. Let's come back to the red herring that there's nothing in the record about the baseball field. Isn't the deed in the record? Yes, but we don't know what part, if any, of the baseball diamond that the reformed deed includes. The school district never offered any evidence of that. Well, if it was part of it, would that not be important? I don't think it would be important anyway because there's no evidence that either the board or the ops said that the baseball diamond was some defining boundary characteristic of the case. Now, the district says so in its brief, but I urge the court to look at the record. There's not a shred of evidence that this boundary or this baseball diamond had anything to do with the parcel envisioned by the appraiser. He's looking at, here's the building. We need an adequate land-to-building ratio. We project the boundaries from the known frontage. We get a 50,000-square-foot parcel. This is what I believe is worth $180,000. This is what should be a minimum selling price of $150,000. That was the fundamental cornerstone of this transaction, and it persisted not only from the initial appraisal but throughout all these resolutions which referenced the same minimum selling price based on the appraiser's findings, findings based on a 50,000-square-foot parcel. It is inaccurate for opposing counsel to suggest that my client determined his bid out of thin air or some whimsical way. He testified clearly that he wanted to be as close to the minimum selling price as possible. Now, the amount over and above the minimum selling price he chose was based upon some numerical thing that he thought would be lucky, but the fundamental basis of his bid was the minimum selling price, a minimum selling price based upon the appraisal, a minimum selling price approved by the board on two occasions based on the same appraisal. I would like to invite the court's attention to the sale national bank case that's cited in our brief. It's at page 7. There's a discussion there. This is virtually the same set of facts. We had there an auction sale where the literature contained a general description of what was being sold which was part of the condominium complex as well as a survey, meets and bounds description. Neither party, as in this case, checked to make sure that the survey corresponded to the general description in the sales brochures. The evidence, although it was disputed at trial, the trial judge thought that the, they accepted the buyer's version that both parties were relying on the general description and not on the survey. The appellate court said this is a factual, fact-intensive inquiry. If there is any evidence in the record that would support the decision of mutual mistake, it ought to be affirmed on appeal. Notwithstanding, a survey that has a defined meets and bounds description that differs from the description offered in evidence by the buyer, the agreed buyer in support of the reformation. These sale and gross cases relied on by opposing counsel have nothing to do with this case. The sale and gross cases are not mutual mistake cases. If you look at the decisions, they say the plaintiff or whoever is complaining about the property description say there was no evidence to support mutual mistake. So those cases are distinguishable because here there is evidence that supports mutual mistake, and the trial court made a specific finding of mutual mistake. It is also erroneous for opposing counsel to say that the judge took this decision or took this description out of their hand. She heard the appraiser's testimony as to how he envisioned the boundary lines. She heard the op's testimony that they thought the boundary lines were the same thing envisioned by the appraiser. All she had to do was project the rear boundary to contain the 50,000 square feet. Well, now, did that include the portion of the baseball field? I don't know. But I mean, you're saying that that was not anywhere in the record whether or not that part. Right, right. And it really makes no difference because the issue is whether or not the school board and the op's were on the same page. Counsel, your time's up. Would you mind commenting just briefly on the issue of attorney fees? It's a moot issue. There's a final judgment entered in this case. It doesn't contain attorney fees. No, we're not asking for attorney fees. We didn't ask for it in the trial court, and we're not looking for it. It's not in the judgment. Thank you so much for your time, Judge. Thank you. Mr. Swain, rebuttal. Thank you, Your Honor. Could you explain the attorney fees that you are opposed to? Could I explain the attorney fees? Yeah. He says they're not in the order. They were ordered from the bench, and then in issuing a written judgment, there was no ordered fees in the judgment. So that's not a problem. I think the door's still open for a petition to be brought forward. The judge has set forth a new legal description. And counsel here is saying no attorney fees. Is that not binding? As long as that's the law of our case, then I'm comfortable. I'd like to read the following for you, please. This is at page 21 of our briefs. This is testimony from Mr. Hopper. Looking back at the bondage survey, and mixing questions and answers, if we were to look at this reason just beyond the door that we found, which was the bondage moved by the circuit court, there's a ball field there, isn't there? Answer, that's the Little League baseball line. Currently in use? T-ball line, we call it. Question, did anybody ever tell you you were supposed to get all the part of the ball field? Answer, no. Did you ever ask Mr. Harsey, I think I would like all the part of the ball field? No. Did the Board of President ever say, we want to give you all the part of the ball field? No. There was no evidence of any alternative boundaries offered at trial. Because there are no alternative boundaries to consider. Mr. Hop himself testified that there were different ways to expand the boundaries. It is an irregular parcel. But there actually were different ways to expand the boundaries, because it's part of, subdivided out of a large campus. But he himself had made several different calculations about how the boundaries might be expanded in different ways. There is no straightforward way to do this here. The circuit court heard judgment, actually found that the school district particularly intended to convey a new legal description, which is not mentioned anywhere in the record. Counsel makes many comments, essentially inferring that there were negotiations between Mr. Rapp and the district superintendent. Again, that might be relevant if we had fraud alleged. And it might be relevant if the superintendent were the principal party, were the party of interest. But the parties here were the cops and the school board. And the relevant inquiry is into the intent of the school board, which is set forth in the resolutions and the public notices issued by the board. The superintendent wouldn't be, like, their agent? Sure, he would be their agent, yes. And so if there were fraud being alleged, we might have a different issue. But where the inquiry is into the board's own intent, then I don't see that any statement by that superintendent in a mutual mistake case where they must show an actual meeting of the minds. I don't see that anything the superintendent bears upon the board's intent. This is not a case of fraud. That's critical here. So you're saying that for reformation, there has to be meeting the minds of the principals and that the agents can never bind to principals? Yes, sir. And an agent can never bind to principals? Sure, agents can bind to principals. But we never had an agent binding a principal here either. You know, we had an agent saying, here's a preliminary appraisal. It said 50,000 square feet, subject to survey. And then we had a litany of paper documents showing the board's actual intent. I think you see it's not the most poignant way to put this. If there were some overage, and the board issued public notices offering 60,000 square feet for sale, for whatever count is enacted by the board to get 10,000 square feet back because a preliminary appraisal said 50,000 subject to survey, the boundaries were drawn. The meets and balances were reported. Every document that formed the basis of the sale referred to the survey, referred to the actual square footage as it was conveyed. If the record supports a mutual mistake, would you believe that LaSalle Bank says that the plaintiff wins? Actually, I think Wheeler-Dealer applies here, much more so than the LaSalle Bank case. Because that's a unilateral mistake in Wheeler-Dealer. That's what the court found. That was a case where the property was sold by common interest, but it turned out that the legal description omitted part of the rear of the property. And after reviewing the testimony, and after reviewing the facts, the court found that there was never a meeting of the minds. I think the best thing to show here is there was never a meeting of the minds between themselves and the school board. And in that case, the sedition is the remedy, in fact. Thank you for your time. Thank you, counsel. The court will take the matter under advisement and render its decision. The court will stand at short recess. All rise.